**FILED**
**Aug 04, 2023**
**08:32 AM(CT)**
**TENNESSEE COURT OF**
**WORKERS' COMPENSATION**
**CLAIMS**



# TENNESSEE BUREAU OF WORKERS' COMPENSATION
# IN THE COURT OF WORKERS' COMPENSATION CLAIMS
# AT JACKSON

| | | |
|---|---|---|
| **BRAD WIGDOR,** | ) | **Docket No. 2022-07-0416** |
| **Employee,** | ) | |
| **v.** | ) | |
| | ) | |
| **ELECTRIC RESEARCH & MFG.** | ) | **State File No. 41066-2021** |
| **COOPERATIVE, INC.** | ) | |
| **Employer,** | ) | |
| **And** | ) | |
| | ) | |
| **SENTRY CAS. CO.,** | ) | **Judge Robert Durham** |
| **Insurer.** | ) | |

## COMPENSATION ORDER GRANTING BENEFITS

The Court held a Compensation Hearing on July 20, 2023, to determine the appropriate impairment rating to use in assessing Mr. Wigdor's permanent disability.[1] Mr. Wigdor contends that he has submitted clear and convincing evidence to rebut the impairment rating assessed by the Medical Impairment Rating Registry (MIRR) doctor, Dr. Michael Calfee. The Court holds he did not do so, and that Dr. Calfee's rating of five percent impairment is the appropriate rating to use in determining Mr. Wigdor's permanent partial disability.

## History of Claim

Mr. Wigdor suffered a dislocated patella in his right knee when he slipped and fell at work on May 7, 2021.[2] The injury caused severe pain and significant swelling in his right

---

[1] Mr. Wigdor also made an offer of proof to contest the constitutionality of the workers' compensation statute. The Court has no jurisdiction to consider such an issue, and this order will not address it.

[2] The parties stipulated that Mr. Wigdor suffered a compensable injury and had returned to work for ERMCO at his pre-injury wage or greater. They also stipulated to a compensation rate of $707.02 and that ERMCO is entitled to a credit of $481.68 due to overpayment of temporary disability benefits.

1

leg. He received authorized treatment from Jason Hutchison, M.D., who is a board-certified orthopedist with twenty years of experience. Dr. Hutchison performed surgery to repair the patella and remove several loose chondral bodies.

Mr. Wigdor continued to suffer from significant swelling and severe pain in his right leg and foot that was disproportionate to his injury. He eventually exhibited skin and joint changes that led Dr. Hutchison to diagnose complex regional pain syndrome (CRPS). He referred Mr. Wigdor to his partner, Dr. Eric Homburg, for evaluation and treatment. Dr. Homburg confirmed Dr. Hutchison's CRPS diagnosis and began treating Mr. Wigdor with physical therapy and a series of lumbar nerve blocks.

Dr. Hutchison placed Mr. Wigdor at maximum medical improvement on February 9, 2022. He felt that Mr. Wigdor's CRPS had "resolved" and additional treatment was unnecessary. He released Mr. Wigdor to return to work with no restrictions.

Dr. Hutchison gave Mr. Wigdor a five percent lower extremity impairment for the displaced patella. He also placed Mr. Wigdor in Class One for CRPS Type-1 due to having "all the vasomotor changes in his lower leg" and gave him an additional seven percent lower extremity impairment. Dr. Hutchison combined the two ratings and converted them to a five percent whole body impairment. He later confirmed this rating in a C-32 Standard Form Medical Report.

Mr. Wigdor challenged Dr. Hutchison's impairment through an independent medical examination conducted by Dr. Samuel Chung, D.O., in July 2022. Dr. Chung is a physiatrist with almost thirty years of experience and is board-certified as a physical medicine and rehab specialist and independent medical evaluator.

In his deposition, Dr. Chung described Mr. Wigdor's examination. He found that Mr. Wigdor had swelling and loss of sensation, strength, and motion in his right knee and ankle when compared to the left. He also noted that the skin temperature felt cooler on the right, the skin was smoother, and there appeared to be less hair on the right shin and ankle area compared to the left.

Based on his exam, Dr. Chung agreed with Dr. Hutchison that Mr. Wigdor suffers from CRPS Type-1 in his right leg. However, he differed in his opinion on impairment. Referring to Table 16-13 of the American Medical Association's Guide to the Evaluation of Anatomic Impairment, 6th edition, Dr. Chung determined that Mr. Wigdor met six of the "objective diagnostic criteria points" in his right leg as described in Table 16-14. He had mottled and cyanotic skin color.[3] His skin was cool, dry, and smooth and non-elastic when

---

[3] Dr. Chung did not mention this symptom in his testimony about Mr. Wigdor's examination. Further, the testimony in the deposition was qualified by the phrase "(as said)." Although not explained, the Court took this to mean that while he did not observe the discoloration, Mr. Wigdor told him about it, or he noted it

2

compared to the left leg. He felt Mr. Wigdor also suffered from joint stiffness and hair growth change.

Dr. Chung then turned to Table 16-15 of the Guides. Since Mr. Wigdor had six "criteria points," Dr. Chung determined that he belonged in Class Two, which provides a range of impairment from fourteen to twenty-five percent to the lower extremity. He felt that Mr. Wigdor's functional history and clinical studies placed him under Grade Modifier II and the physical exam gave him a Grade Modifier III, providing him with an overall net adjustment of +1. Thus, Dr. Chung placed Mr. Wigdor in Class Two, Grade D for a twenty-three percent lower extremity impairment, which converts to nine percent whole body impairment.

Dr. Chung also addressed the difference in his impairment and that of Drs. Hutchison and Calfee. He said that CRPS symptoms may change depending on the time of the exam, and that there are some subjective components to symptoms, like temperature and skin smoothness and elasticity, but the important thing is for the examiner to carefully compare both extremities and note the differences. He added that differences in medical evaluations could be due to the evaluating doctor's "clinical astuteness" in seeing symptoms and identifying "nuances of clinical manifestations."

Finally, Dr. Chung recommended that Mr. Wigdor avoid prolonged and extensive use of the right leg. He said that Mr. Wigdor's knee could worsen with continued use and eventually require a knee replacement.

Upon receiving Dr. Chung's opinion, ERMCO requested an evaluation through the MIRR. Michael Calfee, M.D., performed the evaluation in September 2022. Dr. Calfee is board-certified in orthopedic surgery and sports medicine and has been in practice for over twenty years. He has also provided dozens of MIRR evaluations.

The parties took Dr. Calfee's deposition about his findings. He agreed that Mr. Wigdor suffers from CRPS Type-1 due to his work-related knee injury. On examination, he found that Mr. Wigdor had normal sensation in his right leg, but the leg was slightly cooler to touch than the left. He observed that the right leg's skin was slightly drier than the left but felt the elasticity was equal. The color was "definitely mottled and cyanotic" when compared to the left. Dr. Calfee did not see any soft tissue atrophy or joint stiffness. He did not see any nail changes, and hair growth appeared to be normal when compared to the left leg. Finally, he noted "palpable crepitance" in the right knee.

Dr. Calfee then testified how he calculated Mr. Wigdor's impairment based on his exam. First, he pointed out that the AMA Guides direct that a CRPS impairment is a "stand-

---

from the medical records.

alone impairment" in that if it is used to determine impairment, no other impairment may be added to it. Thus, while Mr. Wigdor suffers from knee issues, that condition cannot be used to determine impairment.

Dr. Calfee went on to say that Mr. Wigdor's leg met four of the criteria necessary for rating CRPS. The skin color was mottled; it was cooler than the left; it was drier; and it was swollen. Given that he only met four criteria, Mr. Wigdor would fall under Class 1 for CRPS in Table 16-15, which has a range of one to thirteen percent lower extremity impairment.

He then adjusted the impairment based on grades within the class. He felt Mr. Wigdor's functional history placed him in Grade 1, but his physical exam and his clinical studies were both Grade 2. This adjusted Mr. Wigdor's impairment to thirteen percent, which equals a five percent whole body impairment.

When asked to compare his impairment with Dr. Chung's, Dr. Calfee explained he did not believe there was any change in hair growth and skin elasticity between the right and left leg, and Dr. Chung did. This was the difference between a Class 1 CRPS impairment and a Class 2. He felt that he was as "meticulous as [he] possibly could" be in making an accurate assessment.

On cross-examination, Dr. Calfee was asked whether Mr. Wigdor's symptoms could wax or wane over time. He responded that he felt hair loss and elasticity would remain stable, since his evaluation had been more than a year after Mr. Wigdor reached maximum medical improvement. He agreed that the only differences between his rating and Dr. Chung's was based on their subjective observations. He admitted he does not have any specialized training in CRPS, and there was nothing special about his exam.

In addition to the expert testimony, Mr. Wigdor also testified about his condition. He said that he still has significant swelling in his knee, particularly after standing on it at work. With activity, the color of the skin on his right leg will turn shiny and grayish purple. He suffers from significant knee pain and walks with a limp. His knee "pops like a machine gun" and feels unstable like it is going to give way. He cannot climb ladders and inclines give him trouble. He wears a knee sleeve that he has to replace every few weeks. He rated his CRPS pain as a "seven" out of ten and said it feels like he has a pebble in his shoe all day.

He testified that he continues to work at ERMCO full duty, but his pace is slower now and his supervisor has admonished him about it. He plans to continue working at ERMCO because he does not believe he could get a job elsewhere.

When asked about his evaluations by Drs. Chung and Calfee, Mr. Wigdor said that Dr. Chung might have been a little more thorough than Dr. Calfee. He did not testify about

4

hair loss or his skin elasticity other than to admit on cross-examination that he said in his deposition that his skin elasticity was "pretty good." Mr. Wigdor did not submit any pictures of his affected leg or present it for examination by the Court.

Mr. Brad Earp, Mr. Wigdor's immediate supervisor, also testified about Mr. Wigdor's physical ability and work activities. He admitted that Mr. Wigdor walks with a limp and more slowly than before the injury; however, he described Mr. Wigdor as an exceptional employee who has no problem performing his job and who often volunteers for overtime. Mr. Earp said he wished he had more employees like Mr. Wigdor.

**Findings of Fact and Conclusions of Law**

Mr. Wigdor has the burden of proving the essential elements of his workers' compensation claim by a preponderance of the evidence. *Scott v. Integrity Staffing Solutions,* 2015 TN Wrk. Comp. App. Bd. LEXIS 24, at *6 (Aug. 18, 2015). However, in this case, the parties have stipulated to all but one issue—Mr. Wigdor's permanent disability from his work-related injury. To resolve this dispute, the Court must determine whether Mr. Wigdor rebutted the statutory presumption afforded to Dr. Calfee's impairment rating by clear and convincing evidence.

In Tennessee, a permanent disability award depends on the employee's impairment rating under the American Medical Association's Guide to the Evaluation of Anatomic Impairment, 6th edition. *See* Tenn. Code Ann. § 50-6-204(k) (2022). However, the AMA Guides are often open to interpretation, which leads to differing impairment opinions.

To help resolve these differences, the legislature authorized the Bureau to create the MIRR. Tenn. Code Ann. § 50-6-204(d)(5). When a dispute exists between doctors as to the impairment rating, the parties may choose a neutral physician from the MIRR panel who is specifically trained in assessing impairment under the AMA Guides. This doctor's impairment rating is presumed correct, and the presumption may only be overcome by clear and convincing evidence. Tenn. Code Ann. § 50-6-204(d)(4).

The Tennessee Supreme Court has defined "clear and convincing evidence" to mean that the evidence is so clear that "there is no serious or substantial doubt about the correctness of the conclusions to be drawn from [it]." *Mansell v. Bridgestone Firestone N. Am. Tire, LLC*, 417 S.W.3d 393, 411 (Tenn. 2013). The Court must focus "on the evidence offered to rebut the physician's rating" in deciding if this standard has been met. *Id*.

Examining the evidence, the Court first notes that three doctors have provided their opinions regarding Mr. Barnett's impairment. When weighing expert opinions, the Court may consider, among other things, "the qualifications of the experts, the circumstances of their examination, the information available to them, and the evaluation of the importance of that information by other experts." *Bass v. The Home Depot U.S.A, Inc.*, 2017 TN Wrk

5

Comp. App. Bd. LEXIS 36, at *9 (May 26, 2017).

Here, all three doctors are qualified to provide opinions. Dr. Hutchison is a board-certified orthopedist with over twenty years of experience. Dr. Calfee is also a board-certified orthopedist with decades of experience and has also served as a MIRR panel doctor for many years. Dr. Chung is a board-certified physiatrist as well as a certified independent medical examiner, who also has more than twenty years of experience. The Court finds that none of the doctors hold an advantage in qualifications when assessing the weight of their testimony.

All three doctors believe that Mr. Wigdor suffers from CRPS Type-1 due to his right knee injury, and all three provided an impairment rating for this condition. As noted in the medical depositions, the only real difference between Dr. Calfee's and Dr. Chung's opinions is that Dr. Chung felt Mr. Wigdor's right leg showed patterns of hair loss and inelasticity that Dr. Calfee did not find. According to Dr. Chung, these additional findings placed Mr. Wigdor in Class Two of Table 16.4 of the AMA Guides, thus warranting a nine percent whole body impairment. Since Dr. Calfee did not make those findings, he placed Mr. Wigdor in Class Two, which limited Mr. Wigdor to a five percent impairment.

As for Dr. Hutchison, he mistakenly provided an impairment for the knee condition as well as CRPS, even though Dr. Calfee testified that the AMA Guides mandates that CRPS is a "stand-alone" impairment that should not be combined with other conditions. Nevertheless, Dr. Hutchison's impairment is of some significance since he placed Mr. Wigdor in Class One for his CRPS. This serves to support Dr. Calfee's assessment.

Of course, Mr. Wigdor's testimony must also be taken into consideration. Mr. Wigdor was a candid, credible witness who provided balanced testimony. However, at trial, he did not mention experiencing hair loss on his right leg, and he admitted that he felt the elasticity of his skin was "pretty good." He also did not provide pictures or give the Court an opportunity to observe the right leg. Finally, the best he could say of Dr. Chung's examination was that it might have been a little more thorough than Dr. Calfee's.

As stated above, Mr. Wigdor bears the burden to rebut Dr. Calfee's opinion by clear and convincing evidence. In *Rodgers v. Rent-A-Ctr East, Inc.*, 2020 Tenn. LEXIS 280, at *14 (Tenn. Workers' Comp. Panel July 29, 2020), the Panel wrote that "[a] disagreement between medical expert witnesses as to the proper diagnosis of an employee's condition may not, in and of itself, constitute the clear and convincing evidence needed to overcome the statutory presumption of accuracy afforded an MIR physician's impairment rating." (internal citations omitted).

In *Rodgers*, the MIRR doctor observed no evidence of radiculopathy while the treating physician did. The Panel found that a differing diagnosis was not sufficient to overturn the MIRR panel doctor's opinion.

In this case, Dr Calfee, the MIRR panel doctor, found no evidence of hair loss or loss of elasticity in the affected leg. The independent medical evaluator Dr. Chung did. Dr. Chung attributed these different findings to the "nuances" of clinical examination. The Court holds that these "nuances," especially given this record, are insufficient to establish serious or substantial doubt about Dr. Calfee's impairment rating. Thus, according to statute, Mr. Wigdor's vocational impairment must be based on Dr. Calfee's whole-body impairment of five percent.

IT IS, THEREFORE, ORDERED THAT:

1. ERMCO shall pay Mr. Wigdor  an award of permanent partial disability benefits based on a five percent permanent medical impairment, which equates to $15,907.95 less an overpayment of $481.69 in temporary disability benefits, or a lump sum award of $15,426.25.

2. Mr. Wigdor's counsel shall receive an attorney's fee of twenty percent of the award, which equates to $3,181.59.

3. Dr. Jason Hutchison shall remain Mr. Wigdor's treating physician for his work-related back injury.  ERMCO shall pay for reasonable, necessary, and related medical treatment for these injuries.

4. This Compensation Order constitutes a final adjudication upon the merits of Mr. Wigdor's claim for benefits.

5. ERMCO shall pay court costs of $150.00 to the Court Clerk within five business days of this order becoming final.  Mr. Wigdor may also file a motion for reasonable litigation expenses, including but not limited to, Dr. Chung's deposition fee and court reporter fees.

6.. ERMCO shall prepare and file with the Court Clerk a Statistical Data Form within ten business days of the date this order becomes final.

7. Absent an appeal, this order shall become final in thirty days.

   **ENTERED August 4, 2023.**


   _____
   **ROBERT DURHAM, JUDGE**
   **Court of Workers' Compensation Claims**

# APPENDIX

Technical Record:
1. Petition for Benefit Determination
2. Dispute Certification Notice
3. Notice to Attorney General
4. Rule 24.04 Notice to Attorney General
5. Notice of Appearance from Attorney General
6. Motion to Exclude Testimony of Hal Currin
7. Response to Motion to Exclude Testimony
8. Reply to Response to Motion to Exclude Testimony
9. Motion to Dismiss Constitutional Challenge
10. Order Denying Motion to Exclude and Motion to Dismiss
11. Pre-Compensation Hearing Statement
12. Mr. Wigdor's Pre-Hearing Statement
13. ERMCO's Pre-Hearing Statement
14. ERMCO's Witness and Exhibit List
15. ERMCO's Medical Record Index

Exhibits:
1. C-32 Written Medical Report from Dr. Hutchison with attached exhibits
2. Dr. Chung's deposition with attached exhibits
3. Dr. Calfee's deposition with attached exhibits
4. Dr. Hauge's deposition
5. Hal Currin's resume (offer of proof only)
6. Bureau of Workers' Compensation 2022 Annual Report (offer of proof only)

## CERTIFICATE OF SERVICE

I certify that a copy of the Order was sent as indicated on August 4, 2023.

| Name | Certified Mail | Via Fax | Via Email | Service sent to: |
|---|---|---|---|---|
| Charles Holliday Ashley Thomas, | | | X | chuckh@garrettylaw.com athomas@garrettylaw.com |
| Robert Dale Thomas Carrie Johnson, | | | X | dthomas@raineykiser.com cjohnson@raineykizer.com |
| Mara J. Cunningham, | | | X | mara.cunningham@tn.gov |

_____
**PENNY SHRUM, Court Clerk**
**WC.CourtClerk@tn.gov**



# NOTICE OF APPEAL

Tennessee Bureau of Workers' Compensation
www.tn.gov/workforce/injuries-at-work/
wc.courtclerk@tn.gov | 1-800-332-2667

**Docket No.:** _____

**State File No.:** _____

**Date of Injury:** _____

_____
**Employee**

v.

_____
**Employer**

Notice is given that _____

*[List name(s) of all appealing party(ies).  Use separate sheet if necessary.]*

appeals the following order(s) of the Tennessee Court of Workers' Compensation Claims to the Workers' Compensation Appeals Board (check one or more applicable boxes and include the date file-stamped on the first page of the order(s) being appealed):

☐ Expedited Hearing Order filed on _____    ☐ Motion Order filed on _____

☐ Compensation Order filed on_____    ☐ Other Order filed on_____

issued by Judge _____.

## Statement of the Issues on Appeal

Provide a short and plain statement of the issues on appeal or basis for relief on appeal:

_____
_____
_____
_____

## Parties

**Appellant(s)** (Requesting Party): _____ ☐Employer ☐Employee

Address: _____ Phone: _____

Email: _____

Attorney's Name: _____ BPR#: _____

Attorney's Email: _____ Phone: _____

Attorney's Address: _____

*\* Attach an additional sheet for each additional Appellant \**

Employee Name: _____ Docket No.: _____ Date of Inj.: _____

**Appellee(s)** (Opposing Party): _____ ☐Employer ☐Employee

Appellee's Address: _____ Phone: _____

Email: _____

Attorney's Name: _____ BPR#: _____

Attorney's Email: _____ Phone: _____

Attorney's Address: _____

*\* Attach an additional sheet for each additional Appellee \**

### CERTIFICATE OF SERVICE

I, _____, certify that I have forwarded a true and exact copy of this Notice of Appeal by First Class mail, postage prepaid, or in any manner as described in Tennessee Compilation Rules & Regulations, Chapter 0800-02-21, to all parties and/or their attorneys in this case on this the _____ day of _____, 20 _____.

_____
*[Signature of appellant or attorney for appellant]*